**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Wells Fargo Bank NA, | No. CV-17-02492-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Ferruggio Insurance Services of LA Incorporated, et al., | |
| Defendants. | |

Pursuant to Fed. R. Civ. P. 56, Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") filed a Motion For Summary Judgment as to Defendant Ferruggio Insurance Services of L.A. doing business as PenbenLA ("Ferruggio") as to Count One only. Oral argument was held on January 11, 2019. The Court has now considered the Motion (Doc. 54, Mot.), Response (Doc. 60, Resp.), and Reply (Doc. 65, Reply) along with arguments of counsel and relevant case law.

**I. BACKGROUND**

**A. Factual Background**

The following undisputed facts providing relevant background are drawn from the parties' statements of fact and other parts of the record.

Defendant Equa Gaming, an Arizona general partnership, opened a business account ending in 4583 at Wells Fargo (the "Account") on or about August 28, 2009. Defendants Victor Carillo and Dana M. Brannan signed the application for the Account.

On March 12, 2016, Defendant Ferruggio, under the name PenbenLA, issued a check drawn upon Pacific Western Bank made payable to Equa Gaming in the Amount of $100,000 (the "Check"). An employee of Ferruggio deposited the Check directly into the Account at a Wells Fargo branch on March 12, 2016, a Saturday. The Check bore no apparent evidence of forgery or alteration. On March 14, 2016, the Check was posted to the Account and the funds became available for withdrawal. Between March 14 and 16, various debits and withdrawals were made from the Account. After the Check was deposited, Ferruggio directed Pacific Western Bank to stop payment on the Check, and the Check was returned unpaid to Wells Fargo on March 16, 2016. Wells Fargo reversed the $100,000 credit, which caused the Account to become overdrawn.

In addition to the undisputed facts above, Ferruggio asserts the following facts. During the period of March 11–12, 2016, Michael Hand, President of Ferruggio, communicated with Carrillo regarding the payment of $100,000 to be made to Equa Gaming, and that the payment was initially to be made by check. After arranging for the deposit of the Check to the Account, Carillo informed Hand that the funds would not be available immediately, and because time was of the essence, Hand agreed to wire the funds to the Account, which he subsequently did. Ferruggio further contends that during the discussions, Carillo and Hand agreed that a stop payment would be put on the Check.

**B. Procedural Background**

Wells Fargo initiated this action on July 26, 2017 (Doc. 1), filed a first amended complaint on August 14, 2017 (Doc. 17), and a second amended complaint on September 17, 2018 (Doc. 68, SAC), bringing claims against Ferruggio Insurance Services of L.A., Inc. doing business as PenbenLA ("Ferruggio"), Equa Gaming, Victor Carillo, Dana M. Brannan, and Does I-X. Of the various claims brought by Wells Fargo, one was brought against Ferruggio for enforcement of the Check ("Count One") pursuant to A.R.S. Title 47 (codifying the Uniform Commercial Code).[1] Ferruggio filed an answer on November 2,

---

[1] Wells Fargo asserts that Arizona is the applicable law; in any event, Nevada and California have both also adopted Article 3 of the U.C.C. Accordingly, citations herein are to the U.C.C.

- 2 -

2018 (Doc. 75, Ans.), and Wells Fargo now moves for summary judgment against Ferruggio on Count One.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The court need only consider the cited materials, but it may also consider any other materials in the record. *Id.* 56(c)(3). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the movant fails to carry its initial burden, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility, the burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact. *Id.* at 1103. The nonmovant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant's bare assertions, standing alone,

are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). However, in the summary judgment context, the Court believes the nonmovant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

## III. ANALYSIS

Wells Fargo asserts that it has proved a *prima facie* case against Ferruggio, needing "only to prove that the signatures on the Check were authorized and that it is a holder in possession of the instrument." (Mot. at 3). In support of this, Wells Fargo further asserts that Ferruggio "admits that the signatures are authorized." (Mot. at 4) (citing Ans. at ¶¶ 14, 15, 35, 39, 42, 43).

Ferruggio does not argue that the signatures were not authorized or that Wells Fargo is not a holder in possession of the instrument. Rather, Ferruggio argues that it is not liable to make payment on the check because of a defense—an agreement between Ferruggio and Carillo that the check "was not to be deposited and another method of payment would be pursued."[2] (Resp. at 3–4).

Wells Fargo also asserts that even if Ferruggio has a valid defense, Wells Fargo is a holder in due course who took the Check without notice of any defenses or claims, which would limit any defenses proved by Ferruggio. (Mot. at 5–8). Ferruggio contends that Wells Fargo "is not a holder in due course" because Wells Fargo "did not exercise reasonable commercial standards of fair dealing." (Resp. at 4).

---

[2] While Ferruggio asserts that it was clear that the check "was not to be deposited," this contradicts the prior statement made in the same filing. (Resp. at 3) (noting that Carrillo responded by e-mail regarding the wire "[a]fter making the deposit").

- 4 -

Ferruggio also argues that "[a]ny existing security interest claimed by [Wells Fargo] is limited to the amount of Check, less any rightful set-offs and deductions," and that Wells Fargo's security interest cannot exceed $75,278.39, the amount that the account was overdrawn. (Reply at 5–6).

**A. Legal Standard**

When "an unaccepted draft is dishonored, the drawer is obliged to pay the draft . . . according to its terms at the time it was issued . . . to a person entitled to enforce the draft []." U.C.C. § 3-414(b). A "person entitled to enforce" an instrument includes "the holder of an instrument." U.C.C. § 3-301. "If a customer delivers an item to a depositary bank for collection . . . the depositary bank becomes a holder of the item . . . if the customer at the time of delivery was a holder of the item, whether or not the customer indorses the item []." U.C.C. § 4-205. "Depositary banks can be holders in due course of unendorsed checks if the payee is its customer." *Conder v. Union Planters Bank, N.A.*, 384 F.3d 397, 400 (7th Cir. 2004).

In an action brought with respect to an instrument where the validity of signatures is admitted or proved, "a plaintiff producing the instrument is entitled to payment if the plaintiff proves entitlement to enforce the instrument under Section 3-301, unless the defendant proves a defense or claim in recoupment." U.C.C. § 3-308. One such defense a party may raise is that their obligation to pay the instrument was "modified, supplemented, or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement." U.C.C. § 3-117; *see also* § 3-305(a)(2) ("[T]he right to enforce the obligation of a party to pay an instrument is subject to . . . a defense of the obligor stated in another section of this Article[.]").

However, "[t]he right of a *holder in due course* to enforce the obligation of a party to pay the instrument" is subject only to a limited list of defenses. U.C.C. § 3-305(b) (emphasis added). The rights of a holder in due course are not subject to the defense found in U.C.C. § 3-117.

**B. Prima Facie Case**

    1. <u>Plaintiff is Entitled to Enforce The Check</u>

No party has disputed that the signature on the Check was authorized. In order to enforce the Check, Wells Fargo therefore needs to show that it is a holder of the instrument. It is undisputed that the Check payable to Equa Gaming was deposited by Ferruggio directly into Equa Gaming's account with Wells Fargo. There is therefore no dispute as to material facts affecting whether Wells Fargo is a holder of the Check. Upon receipt of the Check, Wells Fargo became a holder of the Check due to its status as the depository bank. Accordingly, Wells Fargo is entitled to enforce the Check, unless Ferruggio proves a defense.

    2. <u>Ferruggio's Defense Fails</u>

In support of its stated defense, Ferruggio cites to U.C.C. § 3-117 which states as follows:

> Subject to applicable law regarding exclusion of proof of contemporaneous or previous agreements, the obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement. To the extent an obligation is modified, supplemented, or nullified by an agreement under this section, the agreement is a defense to the obligation.

Wells Fargo argues that because Carrillo "was not the person entitled to enforce the instrument, the agreement with him is not a defense to payment of the Check." (Reply at 3).

According to U.C.C. § 3-301, a person entitled to enforce an instrument means one of three things: (1) the holder of the instrument, (2) a nonholder in possession of the instrument who has the rights of a holder, or (3) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to U.C.C. § 3-309 or § 3-418(d). In order to be a "holder," the person must be in possession of the instrument. U.C.C.

§ 1-201(b)(21). Neither Ferruggio nor Wells Fargo contend that Carillo was in possession of the instrument, or that Carillo was a holder pursuant to U.C.C. § 3-309, which pertains to lost, destroyed, or stolen instruments, or U.C.C. § 3-418(d), which pertains to mistake. Given that none of these three categories apply to Carrillo, he cannot be "a person entitled to enforce an instrument" in this case. The U.C.C. provides that Wells Fargo became the holder of the check at the time it received the check for deposit. *See* U.C.C. § 4-205.

Any separate agreement made between Ferruggio and Carillo is therefore not a defense to Ferruggio's obligation to pay the Check. Because there are no disputed facts as to whether Wells Fargo is a holder entitled to enforce the instrument or whether Ferruggio has a valid defense, Wells Fargo has shown that it prevails on Count One.

**C. Holder in Due Course**

As the Court has determined that Plaintiff is entitled to enforce the Check, and that Ferruggio's defense fails as a matter of law, the Court need not address whether Wells Fargo is a holder in due course. *See* U.C.C. § 3-308 cmt. 2 ("Until proof of a defense . . . is made, the issue as to whether the plaintiff has rights of a holder in due course does not arise."). The Court will address the issue anyway in an effort to be complete.

A holder of an instrument becomes a "holder in due course" if

> (1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and
> (2) the holder took the instrument
> > (i) for value,
> > (ii) in good faith,
> > (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series,
> > (iv) without notice that the instrument contains an unauthorized signature or has been altered,
> > (v) without notice of any claim to the instrument described in Section 3-306, and
> > (vi) without notice that any party has a defense or claim in recoupment described in Section 3-305(a).

U.C.C. §3-302; *see also Great W. Bank & Tr. Co. v. Pima Sav. & Loan Ass'n*, 718 P.2d 1017, 1019 (Ariz. Ct. App. 1986) ("A holder-in-due-course of a negotiable instrument must take the instrument for value in good faith and without notice of defenses."). "The critical time for [determining] such notice is when the party comes into possession [of the instrument] as a holder." *Flash & the Boys, LLC v. Samons*, No. 1 CA-CV 13-0531, 2015 WL 673879, at *6 (Ariz. Ct. App. Feb. 17, 2015). "The issue of whether a party is a holder in due course is usually one of fact, although 'where the facts are undisputed and conclusive, a court can determine holder in due course status as a matter of law.'" *Maine Family Fed. Credit Union v. Sun Life Assurance Co. of Canada*, 727 A.2d 335, 340 (Me. 1999) (internal edits omitted) (quoting *Triffin v. Dillabough*, 716 A.2d 605, 611 (1998)); *see also San Tan Irr. Dist. v. Wells Fargo Bank*, 3 P.3d 1113, 1117 (Ct. App. 2000) (whether a party acted in good faith "in a particular case presents a question that ordinarily must be resolved by the fact finder").

Here, no party raised questions or presented evidence indicating that the Check's authenticity should have been called into question or that Wells Fargo took the Check with any particular notice. Ferruggio only contests whether Wells Fargo took the Check in good faith. (Resp. at 4).

1. Definition of "Good Faith"

"Good faith" is defined as "[1] honesty in fact and [2] the observance of reasonable commercial standards of fair dealing." U.C.C. § 1-201(b)(20). The "honesty in fact" prong of the definition "is tested by a subjective standard, inquiring into the actual state of mind of the party," while the "observance of reasonable commercial standards of fair dealing" is measured objectively. *San Tan*, 3 P.3d at 1117. Prior to 1990, the U.C.C. definition of "good faith" only required that the holder prove it acted with "honesty in fact," and the addition of the objective prong has been met with varying interpretation by courts.

Ferruggio does not argue the "honesty in fact" prong of the test, but rather argues that Wells Fargo did not exercise reasonable commercial standards of fair dealing. (Resp. at 4). In doing so, Ferruggio relies entirely on *Maine Family Fed. Credit Union v. Sun Life*

*Assurance Co. of Canada*, a Maine Supreme Court case with relevant facts that are substantially similar to the instant case. 727 A.2d 335 (Me. 1999). In *Maine Family*, after a credit union customer deposited a check into his account at the credit union, the credit union immediately made the funds available to the customer. After the payor of the check placed a "stop payment" on the check, the check was dishonored by the drawee bank, but not before the customer had withdrawn the funds made available by the credit union. The jury found that the credit union had not acted in "good faith" by making the funds immediately available to its customer. In analyzing the "reasonable commercial standards of fair dealing" part of the test, the Maine Supreme Court determined that the "factfinder must . . . determine, first, whether the conduct of the holder comported with industry or 'commercial' standards applicable to the transaction and, second, whether those standards were reasonable standards intended to result in fair dealing." *Id.* at 343. The court affirmed the judgment of the lower court, holding that "the jury could rationally have concluded that the reasonable commercial standard of fair dealing would require the placing of a hold on the uncollected funds for a reasonable period of time and that, in giving value under these circumstances, the Credit Union did not act according to commercial standards that were reasonably structured to result in fair dealing." *Id.* at 344.

While some courts have agreed with *Maine Family*'s reasoning, many courts and commentators have found it faulty. *See, e.g.*, *Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 623 n. 6 (8th Cir. 2014) (noting that "the *Maine Family* test has been criticized for conflating fair dealing with due care"); *Travelers Cas. & Sur. Co. of Am. v. Wells Fargo Bank N.A.*, 374 F.3d 521, 527 (7th Cir. 2004) (finding it "reasonably clear that 'good faith,' as the term connotes, does not include due care," and noting that some cases, including *Maine Family*, have said it does); 1 White, Summers, & Hillman, Uniform Commercial Code U.C.C. § 1:10 (6th ed.) (commenting that *Maine Family* interprets the standard incorrectly and that the "rule could mean that I will not treat you less fairly than I treat others, not that I will use as much care as others").

Accordingly, several courts have distinguished the "reasonable commercial standard of fair dealing" from standards of negligence or due care. *See, e.g.*, *San Tan*, 3 P.3d at 1117 (noting that Plaintiff gained nothing by characterizing Defendant Bank's "conduct as careless, because it is the fairness with which a party handles a transaction, not the care with which it does so, that is the proper focus of inquiry"); *Wachovia Bank, N.A. v. Fed. Reserve Bank of Richmond*, 338 F.3d 318, 323 (4th Cir. 2003) ("To determine whether Wachovia acted in conformity with reasonable commercial standards of fair dealing, we consider the fairness of Wachovia's actions, rather than any negligence on its part."); *Gerber & Gerber, P.C. v. Regions Bank*, 596 S.E.2d 174, 177 (2004) ("[R]easonable commercial standards of *fair dealing* are different from reasonable commercial standards of *due care*."); *see also* 2 White, Summers, & Hillman, Uniform Commercial Code § 18:9 (6th ed.) ("[G]ood faith does not require general conformity to 'reasonable commercial standards' but only to 'reasonable commercial standards of fair dealing.'") ("The issue is one of 'unfairness,' not of 'negligence.'").

The Court finds U.C.C. § 3-103, official comment 4, informative on this issue, which reads in part as follows:

> Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction. Both fair dealing and ordinary care, which is defined in Section 3-103(a)(9), are to be judged in the light of reasonable commercial standards, but those standards in each case are directed to different aspects of commercial conduct.

Accordingly, the Court will look to "the fairness with which [Wells Fargo] handle[d] [the] transaction, not the care with which it d[id] so." *San Tan*, 3 P.3d at 1117.

### 2. Good Faith Analysis

Ferruggio points to the account agreement between Wells Fargo and Equa Gaming, specifically the section referencing that "Longer Delays May Apply." (Resp. at 4–5) (citing Doc. 61-4). The agreement states, in part, that

> [i]n some cases, the Bank will not make all of the funds that you deposit by check available to you on the first *Business Day* after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the fifth or sixth *Business Day* after the day of your deposit . . . . In addition, funds you deposit by check may be delayed for a longer period under the following circumstances: . . . You deposit checks totaling more than $5,000 on any one day

(Resp. at 4–5); (Doc. 61-4). Ferruggio states that "[b]y the terms of Plaintiff's own account agreement, the stated process would have been to delay the availability of the deposited funds because the amount of the deposit was significantly above the $5,000 threshold." (Resp. at 5). However, as Wells Fargo points out, the referenced sections of the agreement do not state that Wells Fargo will always delay availability, but that they "may" do so. (Reply at 5). Wells Fargo also points to the "General" policy regarding availability of funds: "The Bank's policy is to make funds from your check deposits to your checking and savings Accounts . . . available to you on the first Business Day after the day the Bank receives your deposit." (Reply at 5); (Doc. 61-4). Ferruggio, like the court in *Maine Family*, is conflating "good faith" with "due care."

As such, Ferruggio does not point to anything in the record indicating that Wells Fargo was required to place a hold. Nor does Ferruggio point to anything in the record indicating that Wells Fargo acted in an "unfair" manner. Wells Fargo notes that it "accepted the Check for processing in the ordinary course," citing an affidavit from Wells Fargo employee Cynthia Bennett-Parks. (Reply at 5) (citing Doc. 55-1, Ex. A). In the affidavit, Ms. Bennett-Parks further describes that the Check was deposited into the Account on Saturday, March 12, 2016, and that the Check bore no "evidence of forgery or alteration and was not incomplete or irregular in any respect." (Doc. 55-1 at 3–4). Ms.

Bennet-Parks also states that Wells Fargo had no notice that the Check had been dishonored or "that any party had a defense or claim in recoupment." *Id.* at 4.

Accordingly, the Court finds that Wells Fargo acted in "good faith" and therefore is considered a *holder in due course* of the Check.

**D. Security Amount**

Ferruggio also argues that Wells Fargo's security interest cannot exceed $75,278.39, the amount that the Equa Gaming account was overdrawn. (Resp. at 6). Ferruggio cites to U.C.C. § 3-302(e) and asserts that "[a]ny existing security interest claimed by the Plaintiff is limited to the amount of Check, less any rightful set-offs and deductions," and that "[c]ases addressing this issue have also held that the obligation of the Drawer who stops payment on a check is limited to the overdrawn balance on the depositor's account." (Resp. at 5–6).

In reply, Wells Fargo argues that (1) U.C.C. § 3-302(e) does not apply because Ferruggio has no defense, claim in recoupment, or claim to the instrument, (2) Wells Fargo obtained a "security interest in the Check to the extent of the advance to the Account," and (3) "the drawer of an instrument is liable to the holder for the amount of the instrument." (Reply at 6–7).

First, section 3-302(e) provides that "the person entitled to enforce the instrument may assert rights as a holder in due course only to an amount payable under the instrument which, at the time of enforcement of the instrument, does not exceed the amount of the unpaid obligation secured," but only if (1) "the person entitled to enforce an instrument has only a security interest," and (2) "the person obliged to pay the instrument has a defense, claim in recoupment, or claim to the instrument that may be asserted against the person who granted the security interest."

As noted above, Ferruggio's defense fails. And Ferruggio has not asserted any claims in recoupment or claims to the instrument. Accordingly, U.C.C. § 3-302(e) does not apply here.

Second, Wells Fargo asserts that they obtained a "security interest in the Check to the extent of the advance to the Account." (Reply at 6) (citing *In re Consolidated Pioneer Mortg. Entities*, 211 B.R. 704, 711 (S.D.Cal. 1997)). Wells Fargo argues that it provided provisional credit of $100,000 to the Account, and after the credit was reversed, "the Account was negative in an amount exceeding $100,000." (Reply at 6).

According to U.C.C. §4-210(a), "[a] collecting bank has a security interest in . . . an item deposited in an account [] to the extent to which credit given for the item has been withdrawn or applied." In *In re Consol. Pioneer Mortg. Entities*, the court stated that "[i]f the customer only draws against a portion of the available provisional credit, the bank only has a security interest to the extent that the customer has withdrawn uncollected funds." 211 B.R. at 711; *see also Braden Corp. v. Citizens Nat. Bank of Evansville*, 661 N.E.2d 838, 841 (Ind. Ct. App. 1996) (bank allowed customer to withdraw provisional credit and "acquired a security interest in the proceeds of the check to the extent of the withdrawn funds").

The Account statement, (Doc. 55-1, Ex. D), does show that on the day the $100,000 credit was reversed, the ending balance of the account was a negative balance in excess of $100,000. However, the next day the negative balance was no longer over $100,000 due to the reversal of recent debits on the Account. And at the time the account was closed, the ending balance was negative $75,278.39. (Resp. at 6) (Doc. 55-1, Ex. D). If Wells Fargo were able to recover for the total amount of the provisional credit, as opposed to the amount for which the Account was ultimately overdrawn, the result would essentially allow Wells Fargo to receive more than the credit that was "withdrawn."

Lastly, Wells Fargo argues that Ferruggio is liable for the amount of the instrument. (Reply at 6). Ferruggio cites two cases for the proposition that courts have "held that the obligation of the Drawer who stops payment on a check is limited to the overdrawn balance on the depositor's account." (Resp. at 6) (citing *Falls Church Bank v. Wesley Heights Realty, Inc.*, 256 A.2d 915, 916 (D.C. 1969)) (citing *Maine Family*). In similar cases, plaintiff banks regularly request and are awarded the amount of the dishonored check,

minus subsequent adjustments reducing the bank's overall loss. *See, e.g., Commerce Bank of Univ. City v. EDCO Fin. Servs.*, 379 F. Supp. 293, 294 (E.D. Mo. 1974), *aff'd*, 503 F.2d 1047 (8th Cir. 1975) (plaintiff bank recovered the amount of the dishonored checks, minus "all other sums subsequently deposited in the subject accounts"); *Falls Church*, 256 A.2d at 916) (plaintiff bank recovered only the amount overdrawn by customer); *Maine Family*, 727 A.2d at 337, 346 (after credit union was able to partially recover overdrawn funds from customer, credit union recovered the remaining amount lost from the drawer of the checks); *First of Am. Bank-Ne. Illinois, N.A. v. Bocian*, 614 N.E.2d 890, 891 (Ill. App. Ct. 1993) (plaintiff bank requested and received only the amount that customer's account became overdrawn, not the full amount of the original dishonored check); *Dempsey v. Etowah Bank*, 418 S.E.2d 418, 419 (Ga. Ct. App. 1992) (plaintiff bank requested and was awarded the amount the account was overdrawn).

In this case, due to subsequent reversals of checks and debits, Wells Fargo has not lost the entire amount of the dishonored Check. Wells Fargo asserts that in the event that recovery of the full value of the Check results in a positive balance on the Account, Wells Fargo has a contractual agreement with Carrillo and Equa Gaming "to offset the balance for other debts owed to it by Equa Gaming and Carillo," and that "[u]nder a different factual scenario, a reduction in the amount recovered from the maker of the Check might be appropriate." (Reply at 7).

A separate agreement between Wells Fargo and the Account holders does not give the Court reason to award Wells Fargo more than it lost due to the dishonored Check. Any ancillary debts owed by the Account holders is not relevant to the question at hand. Given that there are no material facts regarding the amount that the Account was finally overdrawn, the Court finds that Wells Fargo can recover the amount of their security interest, $75,278.39, "the extent to which credit given for the item has been withdrawn."
Accordingly, **IT IS ORDERED** that:

1. The motion for summary judgment as to defendant Ferruggio on Count I is **GRANTED.**

2. Ferruggio is liable to Wells Fargo in the amount lost by Wells Fargo, $75,278.39

Dated this 14th day of January, 2019.

_____
Honorable Susan M. Brnovich
United States District Judge